ALEXANDER M. SMITH

*v.*

THEODOR H. SCHOPPER et al.

[Submitted December 9th, 1915. Decided February 9th, 1916.]

1. Where complainant, who was of advanced age and whose hearing and vision were impaired, assigned a large portion of his property to defendant, who occupied towards him a confidential relation, being his trustee, business adviser, and closest intimate, and complainant at that time had no independent advice, defendant has the burden of showing that the transaction was understood by complainant and that it was free and voluntary.

2. In a suit to set aside a gift *inter vivos,* evidence *Held* insufficient to show that complainant understood the nature of the transaction or that it was voluntary.

3. Where defendant, who was complainant's trustee and adviser, coerced him into assigning a large portion of his property, that portion of the property given to defendant's wife and children pursuant to complainant's alleged desire may be recovered; such parties standing in no better position than defendant, to whom the assignment was made.

4. Complainant agreed to make a will in defendant's favor if he would act as his business adviser and personal intimate. Defendant faithfully discharged those duties, but, desiring security, coerced complainant into assigning to him a portion of his property before death, and the defendant having discharged his obligations after the assignment, and the assignment not appearing oppressive, *Quære:* Should not the complainant be required to do equity by compensating the defendant, Theodor, for the services rendered, before a re-delivery is ordered?

---

*Messrs. Hudspeth, Rysdyk & Garrison,* for the complainant.

*Mr. Jerome T. Congleton* and *Mr. Frank H. Bradner,* for the defendants.

GRIFFIN, V. C.

The bill in this cause is filed to obtain a decree setting aside an assignment operating as a gift *inter vivos,* on the ground that it was obtained by undue influence.

The assignment was made by the complainant to the defendant Theodor H. Schopper on the 21st day of February, 1910, when the complainant was sixty-eight years of age and Theodor forty-one years.

On the date of the assignment the complainant was possessed of $41,000 in stocks, bonds and cash, $21,000 of which were held by Theodor as trustee for the complainant, and the assignment operated to transfer all the stocks, bonds and cash so held in trust.

The complainant was, on the date of the assignment, and for some years before, somewhat feeble, mentally, with hearing and vision impaired. He lacked self-dependence and was accustomed to rely upon others.

The relations between them were those of trust and confidence. The complainant relied implicitly on Theodor and was dominated by him.

The instrument was executed by the complainant at the request of Theodor on the morning of February 21st, prior to which time the idea of disposing of any of his property by gift had not been considered by him, nor had such thought been suggested to him.

When the assignment was executed. he was surrounded by Theodor and his wife, Helen B. Smith and Ann Young, sisters of the defendant Mrs. Schopper. There was present no one interested in the complainant with whom he might advise.

All of the property he was then possessed of (excepting accumulations) was derived from his father, who died in 1888, at which time the complainant was employed as a cashier in a large mercantile house in New York City. Almost immediately after his father's death he resigned his position, and has continued out of employment since.

In 1895, complainant's wife died, after which he took up his residence at the home of his older brother, George (whose wife was Helen B. Smith, sister of Mrs. Schopper), in Arlington. On October 4th, 1904, George died, but complainant continued to reside in the house of the widow of George until April 1st, 1912. From the year 1888 until George's death the complainant depended solely upon his brother for companionship and the management and conduct of his business affairs. After the death of his brother, complainant was anxious to secure some person to do for him what his brother had done. He had no relatives by blood, nearer than a cousin, for whom he had little regard.

The complainant and his brother George had known Mr. Schopper for some years. He had favorably impressed George, who, in his lifetime, had spoken well of him to the complainant.

The relations between the complainant and the defendant Theodor had been those of ordinary neighborly friendship, not in any manner approaching intimacy; they had lived in adjoining houses for a number of years; the complainant had no close friends or companions, and did not seek them, depending almost exclusively upon his brother for companionship.

In this situation the complainant sought someone to take the place of his deceased brother, and, within a few days after his brother's death, turned to Theodor. Theodor's statement of what occurred is as follows:

"Well, he came to me and told me that he felt the death of his brother very much and if I would take the place of his brother—his brother was helping him along, as I knew, with what little writing there was to be done, and he wanted me to take the place of his brother like a companion and take an interest in him and advise him and do for him whatever he would need me to do, and if I would do that he would make a will in my favor leaving all his property to me; and I said I would and appreciated the regard he held for me, and I was surprised that he made such an offer, but at the same time I was willing to accept it. I told him my wife and children would also do all in their power to make it agreeable for him and help him wherever they could."

To carry out the understanding thus expressed, the complainant, on October 10th, 1904, six days after his brother's death, made his will, giving all his property to Theodor. This will was substituted by another dated November 2d, 1906, the reason therefor being to conform to the cemetery rules respecting a burial plot, and to strengthen the will, as they understood it, by leaving one dollar to J. E., his cousin; and also one dollar to any other cousin or blood relative he might have upon his decease. Otherwise, the wills were alike. Both these wills were delivered to Theodor and were produced by him at the hearing.

Theodor, his wife and children, faithfully observed and kept the agreement made by Theodor down to August 11th, 1911, when the complainant wrote Theodor demanding a return of his securities. Notwithstanding such demand, he continued to live with Mrs. Smith until April 1st, 1912, when he changed his residence to that of Mrs. Sharp, who is also a sister of Mrs. Schopper, and with whom he resided at the time of the hearing. Prior to this change of residence, Mrs. Sharp, whose relations with her sisters were quite unfriendly, saw the complainant so infrequently that her testimony as to the complainant's condition may be disregarded. During the period prior to the break between the parties the complainant visited the Schoppers three or four times a day; the children served him; the son, Everard Schopper, who was seventeen years old at the time of the execution of the assignment, says he ran errands for him; that the complainant was corpulent, and that he performed tasks for the complainant that were odious, such as "manicuring his toenails."

Theodor attended to complainant's business and investments and collected the income; and while his employment during the

day was rather arduous, he devoted many nights to discussing with the complainant his affairs, and in his entertainment. He also, on Sundays, frequently, with his family, went to Greenwood cemetery, where complainant's parents were buried, and from there they generally visited Coney Island on pleasure, at the request of the complainant, on which trips the complainant paid his own personal expenses and permitted Theodor to pay those of himself and family. Thus, for a period of about seven years, Theodor, a young, vigorous man, with his wife and family, largely gave up the pleasures and comforts of evenings and holidays to the care and entertainment of this unattractive, uninteresting old gentleman.

That Mr. Schopper and his family endured all this discomfort from pure affection is unlikely. In the absence of the agreement they owed him no duty. It is, therefore, apparent that what they did was in the performance of the obligation imposed upon them by the agreement.

In 1905, Theodor discussed the situation with a legal friend and was made aware of his rights and risks under the agreement as to the will.

About the year 1907, Sweetser, Pembroke & Company, a large business house in New York City, became involved, and Mr. Schopper, knowing that practically all of the complainant's wealth was invested with a prominent company at six per cent., suggested the wisdom of investing a part of his funds elsewhere so that he would not be "risking all his eggs in the same basket." Accordingly, in 1907, the complainant drew $15,000 from this account, which Mr. Schopper invested in stocks and bonds, and delivered the same to Mr. Smith, who, for a while, at least, kept them in a small safe in his home. Afterwards, the home being considered an unsafe depository, Mr. Schopper, with the consent of the complainant, placed the securities in Schopper's safe deposit box in New York City, where they remained until February 21st, 1910, when the assignment attacked was made. During these three years the relations of the complainant and defendants seem to have been pleasant and satisfactory.

In January, 1910, on examining his account with the company above referred to, it was found that there was on deposit

twenty-one thousand six hundred and sixty odd dollars.   Mr. Schopper thereupon suggested that Smith reduce the amount of this deposit to $20,000, which would yield him a flat income of $1,200 a year on the investment.   This was done, and the surplus, amounting to sixteen hundred and sixty odd dollars, was withdrawn.   Prior to this date the complainant had also sold some real estate and other property, which, with the above surplus (all of which was deposited with Mr. Schopper and invested by him in stocks and bonds), so increased the investment that on February 21st, 1910, Mr. Schopper held stocks, bonds and cash of complainant amounting to $21,000.

Shortly prior to February 21st, 1910, Mr. Smith, several times, expressed to Mrs. Schopper, whom he had known from childhood, a desire to change his will by leaving something to her and her children.   She said he should not do this, because of his agreement with her husband, that it would look underhanded and would not be right.   A few days prior to February 21st, 1910, Mr. Koch, a member of the bar, called at the house of Mrs. Smith, while Mrs. Schopper was present, for the purpose of drawing such a will; but Mrs. Schopper so strongly protested against it that the complainant abandoned the idea at that time.   Mrs. Schopper informed her husband of these facts.   Afterwards, on the 21st of February, 1910, about nine o'clock in the morning, Mr. and Mrs. Schopper repaired to the house of the complainant and met Mr. Smith.   At this meeting, besides Mr. Smith, were Miss Ann Young, since deceased, Mrs. Smith and Mr. and Mrs. Schopper.   Miss Young and Mrs. Smith were both naturally deeply interested in the welfare and success of Mr. and Mrs. Schopper and their children, and Mrs. Smith so testified.   Thus, at this meeting, it cannot be said that there was anyone present interested in protecting the complainant in the matter then about to be transacted.   Mr. Schopper opened the conversation by upbraiding Mr. Smith for attempting to change his will, calling his attention to the agreement between them.   A discussion then ensued between Mr. Smith and Mr. Schopper, which, with the drawing of the assignment attacked and the agreement to pay Smith $600 a year (which were evidently written in less than an hour), con-

sumed practically the entire morning. It is, therefore, quite evident that they conversed for upwards of an hour, during which a great deal must have been said, and yet the entire conversation testified to by Mr. Schopper is contained in a statement, reiterated several times, of which the following is a sample:

"*Q*. What did you say to him?

"*A*. I said, 'Alec, I hear you want to change that will or make a new will and I don't think it is fair that you should treat me that way behind my back.'

"*Q*. Well, go ahead and tell us all?

"*A*. He said he didn't want to treat us badly, in fact he wanted to make sure that my wife and children got something under the will he was leaving and that none of his relations would get any. I says, if he desired anything like that why he could instruct me to give my wife some bonds that I held for him and also to give some to the children and the rest of the securities which I held he could transfer to me and I would give him four or five hundred dollars a year. Well, he said to give my wife five bonds of a $1,000 each and each of the children one bond of a $1,000, but he thought he ought to have more income than four or five hundred dollars a year, and I suggested, 'Well, would $600 a year be fair?' and he says, 'Yes, that is all right; go ahead and do that—draw up a paper.'"

and thereupon Mr. Schopper wrote the assignment, which did not give any stock and bonds whatsoever to his wife or children, but gave him the entire $21,000 of securities; but he says that he afterwards delivered $7,000 of these to his wife—$5,000 for her and $1,000 each for the children. The assignment was signed by the complainant and witnessed by Helen B. Smith and Ann Young. At the time of the signing Mrs. Smith said to the complainant, "Well, I think you sold yourself cheap." Mr. Smith frowned at her, and said to Theodor, "Is there anything else you want me to sign?" and he said, "No, Alec, I am perfectly satisfied with what you have done." At the same time there was an independent agreement written by Mr. Schopper, and signed by him, wherein he guaranteed to pay to Smith, during the remainder of his life, $150 quarterly, on the 1st days of April, July, October and January of each year. The witnesses to this agreement are Mrs. Helen B. Smith and the defendant Mrs. Schopper.

The assignment (omitting the list of stocks and bonds, the attestation clause, signatures of Theodor and the witnesses) reads as follows:

"In consideration of one dollar U. S. C'y to me in hand paid, the receipt of which is hereby acknowledged, for services rendered and for other valuable considerations, I hereby give outright, to have, own, possess for himself forever, to my friend Theodor Heinrich Schopper, his heirs or assigns, all bonds, stocks, cash and other securities, which he now holds in trust for me and enumerated as follows:"

(Here follows the list of stocks and bonds, after which appears the words, "and cash, $94.11.")

The complainant says he thought he was executing a power of attorney to enable Theodor to deal with the stocks and bonds, and that he did not know he was giving away his property. In this I think he is mistaken, at least to the extent of the bonds given to Mrs. Schopper and her children.

The testimony of Mrs. Smith seems to make it clear that complainant understood he was giving $7,000 to the wife and children. She says she understood the paper was intended to give bonds and stocks to Mrs. Schopper and her children, but her understanding as to any gift of bonds to Theodor being contained in the assignment is, to say the least, very uncertain, and suggests the idea that her knowledge on this subject may have been subsequently acquired. She said, however, quite positively, that she saw complainant read the assignment and heard Theodor read it to him, but she did not remember hearing read the names of the bonds or stocks; she did not think Mr. Schopper read them. This may be a mere lapse of memory on the part of the witness, but it tends to support the theory of the complainant that he did not comprehend the transaction.

Afterwards it may have occurred to Theodor that the assignment and gift might be construed to cancel the agreement to make a will in his favor; he, accordingly, advised with a friend in New York, as a result of which, when he paid the first installment of $150, which fell due under the guaranty, he wrote a receipt as follows:

"Received from Theodor H. Schopper $150 U. S. currency, being first payment under his agreement of February 21st, 1910, to pay me $600 yearly in equal quarterly payments on April, July, October and January 1st: And in consideration of which agreement, and other good and valuable considerations, I gave, sold and transferred to him all my securities valued at twenty-one thousand dollars and agreed to let my will stand in his favour.

"This receipt is amplified in order to show that in addition to valuable considerations for my transfer of securities and action aforesaid, there were also good considerations."

This receipt was signed by the complainant, and his signature attested by Helen B. Smith and Ann Young, as witnesses.

The statement in the last clause of this receipt that it was amplified, &c., to show that "there were also good considerations," is plainly untrue. The so-called amplification consists in the insertion of the words "and agreed to let my will stand in his favor"—its purpose being to have, in writing, signed by the complainant, evidence of a promise to allow the will then made and in possession of Theodor to stand. There is nothing in this receipt that expresses the consideration moving from Theodor to the complainant for the assignment more fully, if as full, as that expressed in the assignment. It might be further said that the very full recital that the assignment gave Theodor $21,000 was written for the purpose of making evidence that the complainant knew the contents of the assignment.

That greater pressure was exerted by Theodor upon the complainant to execute the assignment than that appearing in the meagre testimony of Theodor is readily deducible from (1) his failure to state more of the conversations between them prior to its execution; (2) the fact that before the meeting on February 21st the complainant never entertained the idea of making an immediate gift of any of his property; (3) that before this meeting his purpose was to retain all his property till death and dispose of it only by will; (4) that the first suggestion as to a gift came from Theodor, which gift, as to his wife and children, was as much, if not more, in violation of the agreement to let the will stand. And even assuming that the complainant might willingly change the form of his desired bounty to Theodor's wife and children from a gift by will to a present one, there is nothing to indicate that prior to this meeting he ever considered

the idea of giving immediately to Theodor $14,000, or other part of his assets, and lastly, the complainant's conduct the day following, which shows that he was in fear that, in expressing a desire to change his will, he had, notwithstanding the gifts, lost or weakened the friendship and confidence of Theodor, caused him to visit Theodor and attempt to recover his former position. That he may have entertained these views is not unlikely. Their status had been changed from that of Theodor serving the complainant during life in consideration of the will to that of Theodor being in possession of the $21,000 given for the expressed consideration of services rendered. In such a situation he had reason to believe that Theodor might not continue to render him services which were so disagreeable. The complainant gave no testimony on this subject, apparently, because he had forgotten the transaction; but this may be inferred from the testimony of Theodor, who, on direct examination, said:

"*Q.* What were your relations with Mr. Smith after February 21, 1910?
"*A.* Quite friendly, the same as before. He came over to the house and he made a remark, I know, the next day, that he hoped I wouldn't feel bad about his intention of changing the will. I says, 'That's all right, Alec; I guess I misjudged you,' and he offered to do anything he could to protect me. He asked me if I wanted to get a lawyer to draw up any paper, and I says, 'No, I guess not, I will trust you,' and we agreed to go on and continue in the same way as we had done before, because he promised to let the will stand in my favor."

On February 25th, 1910, Mrs. Schopper rented a box in the Fidelity Trust Company, where she attended with her children and deposited therein seven bonds of $1,000 each, which her husband gave her, pursuant to his unwritten agreement with the complainant and at his request. The Schopper children, however, did not know of the gifts to them until after the death of their aunt Miss Young, which occurred in December, 1910, after which date both the children were informed of the fact, and, by direction of their parents, thanked the complainant for them, and they say he spoke very nicely to them concerning it. No reasonable explanation is given why the parents should withhold the thanks of the children for these gifts for a period of ten

months and then direct their expression. The motive is left to conjecture. It may be that the purpose was to recall the fact to the complainant who, if he did not deny, might be considered as acknowledging the fact long after the gifts had been made, thus making evidence in their favor if the validity of the gifts was thereafter questioned.

In June, 1912, the complainant commenced suit in the Hudson circuit court against Theodor to recover the $16,660 given him to invest. The defendant answered, setting up the assignment aforesaid.

It appears that no copy of the assignment had ever been furnished the complainant by the defendant Theodor. Its existence, when pleaded, surprised the complainant's attorneys, who thereupon filed this bill.

While the complainant had sufficient mental strength to determine the wisdom of the gift under consideration, if surrounded by friends to whom he might go in case Theodor abandoned him, yet, in the situation presented, surrounded as he was by the defendants and the sisters of Mrs. Schopper, who were in no manner interested in his protection, and considering his mental condition, which was somewhat weak, and his age, with vision and hearing quite impaired, he was subject to the domination of Theodor, upon whom he relied and in whom he reposed the greatest trust and confidence. The burden was therefore cast upon the defendants to show that the complainant understood the nature of the act, and that it was not done through the influence of the donees. This they have failed to do. On the contrary, it is perfectly plain that the disposition was not voluntary on his part, but was brought about by the pressure exerted by Theodor upon him. *Haydock* v. *Haydock, 34 N. J. Eq. 570; Huguenin* v. *Baseley, 14 Ves. 273; 6 Eng. Rul. Cas. 834; 2 L. C. Eq. (4th Am. ed.) 1183, 1185.*

As to Theodor, therefore, the assignment should be set aside.

The next question to be considered is: Do Mrs. Schopper and her children stand in a better position to sustain the gifts to them than Theodor? The evidence indicates that the thought of a present gift of part of his property to Mrs. Schopper and her children did not enter the mind of the complainant until

February 21st, 1910, when it was suggested to him by Theodor. Before that time his expressed desire was to leave to the wife and children a portion of his estate by will; but nowhere is there any evidence that before the above date he ever expressed a desire to make an immediate gift to them. It, therefore, is difficult to see where the influence exerted on the complainant to make the gifts aggregating $7,000 to the wife and children differs from that which procured the gift of the $14,-000 to Theodor. This situation was presented in *Huguenin* v. *Baseley, supra,* and in *Bridgman* v. *Green, Wilm. 58, 64.*

In *Huguenin* v. *Baseley, supra,* Lord-Chancellor Eldon said: "With regard to the interests of the wife and children of the defendant there was no personal interference on their part in the transactions that have produced this suit. If, therefore, their estates are to be taken from them, that relief must be given with reference to the conduct of other persons; and I should regret that any doubt could be entertained whether it is not competent to a court of equity to take away from third persons the benefits which they derived from the fraud, imposition or undue influence of others;" and in dealing with the same subject, in *Bridgman* v. *Green, supra,* Lord Chief-Justice Wilmot said: "Whoever receives it must take it tainted and infected with the undue influence and imposition of the person procuring the gift. His partitioning it and cantoning it out amongst his relatives and friends will not purify the gift and protect it against the equity of the person imposed upon. Let the hand receiving it be ever so chaste, yet, if it comes through a polluted channel, the obligation of restitution will follow it."

I will advise a decree setting aside the assignment, and directing that the defendants make restitution.

Having reached this conclusion, a question arises which has not been argued, namely, the defendants gave almost seven years to the companionship and care of this complainant and his property. He has now made a will, which, I assume, leaves nothing to the defendants. And I take it, from the manner in which the case was presented on the part of the complainant, that it is not his purpose to make any compensation to the defendant Theodor. While Theodor erred in the course he pur-

sued, it appears to have been dictated by a desire to have some protection against the instability of the complainant, and not for the purpose of abandoning his former service and companionship; in fact, it appears that he did serve the complainant as faithfully after as before the gift was made. The payment of $600 a year, reserved in the receipt, with the $1,200 which complainant derived from his other investment, gave the complainant ample funds for his maintenance. No attempt was made on the part of Theodor to reduce the income of the complainant to a point which would work a hardship upon him; so, that it might not be said that Theodor wickedly committed such a breach of his trust to the detriment of the complainant that he should forfeit his right to any compensation. The question, therefore, arises whether, before a redelivery is made to the complainant, he should not be required to do equity by compensating the defendant Theodor for his services rendered. *Reeves* v. *White, 84 N. J. Eq. 661.* Upon this I express no opinion, as the point has not been argued. If, however, counsel desire to argue the question, I will hear them on Monday, February 21st, at the chancery chambers in Jersey City.